UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

─────

GARY PETERS,

                      Plaintiff,                          Case No. 1:15-cv-751

v.                                          Honorable Janet T. Neff

BRENDA SIMPSON et al.,

                      Defendants.

_____/

**OPINION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

## Factual Allegations

Plaintiff Gary Lee Peters presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Kinross Correctional Facility, though the actions about which he complains occurred while he was housed at the Bellamy Creek Correctional Facility (IBC).  He sues MDOC Director Daniel H. Heyns[1] and the following IBC officials:  Mailroom Supervisor Brenda Simpson; Warden Kenneth McKee; Deputy Warden Matthew Macauley; Resident Unit Manager Rufus Wright; Assistant Resident Unit Supervisors Wendy Lane and Larry Avery; and Grievance Coordinators M. Robinson and Mitch Vroman.

Plaintiff alleges that he regularly has held the prison job assignment of Electrician or Maintenance Worker since 1986.  While he was housed at the Michigan Reformatory (RMI) between 2009 and 2013, he was assigned to work in maintenance positions, frequently as an electrician, in positions that required special security clearances.  In March 2014, he looked for more information about building and electrical codes and the master electrician's examination.  Plaintiff located two books, Code for Homeowners and The Complete Guide to Wiring.  He consulted the MDOC-IBC Publication Restriction List and found that neither was listed as a prohibited publication.  On March 19, 2014, Plaintiff submitted a Disbursement Authorization/Catalog Order Form, in accordance with MICH. DEP'T OF CORR., Policy Directive 05.03.118 and IBC-OP 04.02.105 and 04.02.130B.  Plaintiff's order was approved by Defendants Avery and Macauley.  The two books arrived in April 2014, and they were delivered to Plaintiff, though the DVD that came with one book was rejected.

---

[1]Plaintiff named "Daniel H. Hynes" as the Director of the MDOC.  Because Defendant's name is spelled "Heyns," the Court uses the correct spelling hereafter.

Thereafter, Plaintiff found a third book to advance his electrical knowledge, entitled Electrician's Calculation Manual. Plaintiff checked the restricted-publication list, and then, on July 20, 2014, submitted another disbursement form. The order was approved by Defendant Avery, and the funds were disbursed from Plaintiff's account. On August 5, 2014, Defendant Simpson issued a Notice of Package/Mail Rejection, claiming that the book was similar to other books on the Publication Restriction List. Plaintiff, however, did not receive a copy of the form. Defendant Lane reviewed the rejection with Plaintiff. When he asked for a copy of the form, Lane told Plaintiff that he would receive a copy at the hearing. On August 7, 2014, Defendant Avery conducted a hearing, but Plaintiff allegedly was not allowed to be present or to make a statement. Plaintiff contends that the hearing was not conducted in accordance with MICH. DEP'T OF CORR., Policy Directive 05.03.118, because the rejection simply quoted section MM of the policy, which prohibits "mail that may pose a threat to the security, good order, or discipline of the facility, may facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner." *Id.* The rejection, however, did not articulate a meaningful legitimate penological explanation of why the book posed a threat. Plaintiff filed Grievance No. IBC 14-08-2259-07Z (Grievance 1) on August 7, 2014, alleging that Defendant Avery denied him pre-deprivation process. Defendant Wright denied the grievance at Step I on September 9, 2014. Defendant McKee denied the Step II grievance on September 23, 2014.

On August 28, 2014, Defendant Simpson ordered a search of Plaintiff's cell and the confiscation of the earlier two books.[2] Plaintiff alleges that Simpson's confiscation of the books was retaliatory. Defendant Simpson issued a Notice of Intent to Conduct an Administrative Hearing on

---

[2]The Administrative Hearing Report indicated that four books were in question. In addition to the two books on electrical wiring, Simpson's Notice of Intent also covered two books on welding.

August 29, 2014, in which she indicated that the books in question were similar in content to other books on the restricted list and that they "could be used by a prisoner to disable the electrical systems in the facility to aid in an escape attem[p]t or to upset the operations of the facility." (Ex. to Compl., docket #1-1, Page ID#31.) Again, Plaintiff alleges that he did not receive a copy of the notice and that Defendant Lane told him that he would receive a copy at the hearing. Defendant Avery conducted a hearing on September 4, 2014, which Plaintiff alleges he was not permitted to attend. Avery provided a copy of the notice of intent and the hearing report. The report again merely recited the rule applied, without specifying the reason why the books posed a threat.

Plaintiff filed Grievance No. IBC 14-09-2518-28J (Grievance 2) against Simpson on August 28, 2014, alleging retaliation and abuse of authority. Defendant Robinson rejected the grievance, stating that Plaintiff was merely dissatisfied with the response he received to another grievance. Defendant McKee denied the grievance at Step II on September 17, 2014.

On September 4, 2014, Plaintiff filed Grievance No. IBC 14-09-2563-07A (Grievance 3) against Defendant Avery, alleging a violation of his right to pre-deprivation process resulting from the improper procedures used by Avery. Defendant Robinson renumbered Grievance 3 as IBC 14-09-2563-28A, and he rejected the grievance as duplicative of Grievance 1. On September 30, 2014, Defendant McKee signed off on the Step II appeal authored by Defendant Vroman.

On September 6, 2014, Plaintiff sent a letter of inquiry to Defendants Macauley and McKee. Neither Defendant responded.

On October 10, 2014, Defendant Heyns added The Complete Guide to Wiring and Codes for Homeowners to the restricted publication list. Plaintiff alleges, however, that Defendant

- 4 -

Heyns has never made a determination as to whether the <u>Electrician's Calculation Manual</u> should be placed on the restricted publication list.  Plaintiff filed a grievance on October 30, 2014, objecting that Defendant Heyns' decision failed to demonstrate how the books were a threat to the good order of the facility.  Defendant Robinson refused to accept the grievance on November 5, 2014, but he gave it an identifier of IBC 14-10-2131-19Z (Grievance 4).  Robinson also provided Plaintiff with the forms needed to make a claim for reimbursement from the State of Michigan.

Defendant Simpson, on October 29, 2014, issued a new notice of mail rejection for the two books placed by Heyns on the restricted publication list.  Defendant Lane conducted a review of the rejection.  Plaintiff claims that he did not receive a copy of the notice.  On November 14, 2014, Defendant Avery conducted a hearing at which Plaintiff was not present, again finding that the books violated the prison rule that was violated.

On November 5, 2014, Plaintiff asked Defendant Lane to notarize the claim for reimbursement from the state, as directed by the instructions on Form DTMB-1104.  Lane refused to do so, because Plaintiff insisted on keeping the form in order to make a copy, as recommended in the instructions.  Lane informed Plaintiff that she would only notarize documents being sent out of the facility.  She suggested that Plaintiff go to the library to obtain service, but Unit Officer Milesi informed Lane that they could not do that.  Plaintiff then filed a grievance against Lane for failing to follow MICH. DEP'T OF CORR., Policy Directives 03.020131 and 05.03.116, which purportedly required Lane to notarize documents on request.  Defendant Wright assigned Grievance No. IBC 14-11-3143-17Z (Grievance 5) and denied the grievance at Step I on November 7, 2014.[3]  On December 4, 2014, Defendant Vroman denied the grievance at Step II, stating that Lane had sent

---

[3]Plaintiff did not file a grievance against Avery, because he believed that it would be considered a duplicate of his first grievance against Avery (Grievance 3).

him to the library for notarization and Plaintiff did not show that his 1104 form was not notarized or that he did not have a copy of the notarized form.  (Ex. OO to Compl., docket #102, Page ID#72.) Plaintiff appealed to Step III on December 5, 2015.

Plaintiff sent a memo to Defendant Simpson on January 25, 2015, asking for an explanation of the policy regarding book orders.  Simpson replied that she did not know who reviewed book orders prior to disbursement, but the orders had to be signed initially by a prisoner's ARUS.  She also told Plaintiff that the order was audited to ensure that the proper amount of money was sent.  Simpson also advised Plaintiff that "[a]ll books are subject to review and may be rejected."  (Compl. ¶ QQ, docket #1, Page ID#14.)

On March 26, 2015, Plaintiff was transferred to the Kinross Correctional Facility (KCF), purportedly in violation of an MDOC memorandum signed by Dennis Dyke in 1993, providing that prisoners who had previously successfully completed a period of incarceration in the Upper Peninsula would not ordinarily be sent back, if they had no disciplinary problems.  In 2002, Dyke reiterated the general policy.  (Compl. ¶ SS, Page ID#14; Ex. 5 & 6 to Compl., docket #1-2, Page ID##102-03.)  Plaintiff alleges that his transfer was the result of a conspiracy to retaliate against Plaintiff for filing grievances against Defendants Lane, Wright, McKee, and Trierweiler. When he arrived at KCF, he filed a grievance against the IBC Defendants for retaliatory harassment, which was given the identifier of IBC 15-04-0908-28C (Grievance 6).  On April 8, 2015, Defendant Robinson rejected the grievance at Step I, on the ground that it raised more than one issue. Defendant McKee affirmed the rejection at Step II on May 20, 2015.  Plaintiff appealed to Step III. Plaintiff contends that he has not received any responses from Defendant Heyns concerning this or any of his other Step III appeals.

- 6 -

On June 11, 2015, Defendant Simpson contacted D. Bruni at KCF, advising that Plaintiff was required to provide a disposition for his books: (1) mail the books out of the prison at his own expense; (2) donate the books; or (3) have the books destroyed. Plaintiff authorized the mailing of his books. At the same time, he submitted two grievances to Defendant Robinson, one for denial of due process and the other for retaliatory harassment. Robinson provided only one grievance identifier: IBC 15-06-1730-07A (Grievance 7). Plaintiff does not allege the resolution of that grievance at any step.

Plaintiff claims that Defendants violated prison policy and the Due Process Clause during the confiscation of his books. He also alleges that he was transferred to KCF in retaliation for filing grievances, in violation of his First Amendment rights. In addition, Plaintiff claims that Defendants have deprived him of his First Amendment rights by preventing him from rehabilitating himself by learning electrician skills. Finally, he alleges that Defendants conspired to violate his rights.

For relief, he seeks compensatory and punitive damages, together with an injunction barring prison officials from arbitrarily rejecting educational materials.

## Discussion

I.      Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.    Conspiracy

Plaintiff alleges that, "[o]n March 26, 2015, Defendant[]s Wendy Lane, Rufus Wright, Kenneth Mc[K]ee, and Deputy Warden Tony Trierweiler,[4] conspired to transfer Plaintiff from the IBC facility to a facility in the Upper Peninsula contrary to MDOC Memorandum from Dennis Dyke."  (Compl. ¶ 35, docket #1, Page ID#14.)  A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action."  *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).  The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff.  *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).  Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff's allegations of conspiracy are wholly conclusory and speculative.  He alleges only that he was transferred.   He alleges no facts to support his assertion that Defendants agreed to deprive Plaintiff of a federal right or even that the named Defendants took any action to have him transferred. As the Supreme Court has held, such allegations do not even hint at a "possibility" of conspiracy, much less contain "enough factual matter (taken as true) to suggest that

---

[4]Tony Trierweiler is not named as a Defendant in this action.

an agreement was made." *Twombly*, 550 U.S. at 556.  Plaintiff therefore fails to state a plausible claim of conspiracy.

## B.   Supervisory Liability

Plaintiff's only remaining allegations against Defendants McKee, Robinson, Vroman, and Macauley involve their denials of his grievances and, implicitly, their failure to supervise their subordinates.  Plaintiff also alleges that, among other things, Defendant Heyns failed to supervise and answer his grievances.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).   A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has failed to allege that Defendants McKee, Robinson, Vroman, and Macauley engaged in any active unconstitutional behavior.  Accordingly, he fails to state a claim against them, and they will be

dismissed from the action.  For the same reasons, Plaintiff fails to state a claim against Defendant Heyns based on Heyns' failure to supervise his employees or address his grievances.

Moreover, to the extent that Plaintiff alleges that any Defendant failed to properly process or resolve his grievances, he fails to state a claim for another reason.  Plaintiff has no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process.

### C.    Due Process

Plaintiff makes a number of allegations about how he was deprived of due process. First, he claims that Defendants Simpson, Avery, Lane, and Wright deprived him of due process when they failed to adhere to prison policy when intercepting and confiscating his books on electrical wiring and that their actions denied him due process.  Second, he complains that he was transferred to the Upper Peninsula in violation of a prison policy.  Third, he appears to allege that

- 11 -

Defendant Heyns denied him due process when he placed the two electrical books on the restricted-publication list.

### 1.    Confiscation of books

Plaintiff contends that the confiscation of his books by Simpson, Avery, Lane, and Wright violated prison policy and the Due Process Clause.  To the extent that Plaintiff bases his claim on a violation of prison policy, he fails to state a claim.  A defendant's alleged failure to comply with an administrative rule or policy does not itself rise to the level of a constitutional violation.  *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Brody v. City of Mason*, 250 F.3d 432, 437 (6th Cir. 2001); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest).  Section 1983 is addressed to remedying violations of federal law, not state law.   *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney*, 501 F.3d at 580-81.

Moreover, Plaintiff's due process claim against Defendants is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986).  Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy.  Plaintiff indicates that he did not receive proper hearings in accordance with prison policy.  He therefore necessarily contends that the deprivations by Simpson, Avery, Lane and Wright were random and unauthorized.  If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law."  *Parratt*, 451 U.S. at 537.  This rule

- 12 -

applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Because Plaintiff's claim is premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case. Plaintiff has not alleged that state post-deprivation remedies are inadequate. Moreover, numerous state post-deprivation remedies are available to him. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MICH. DEP'T OF CORR., Policy Directive 04.07.112, ¶ B (effective Dec. 12, 2013). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. MICH. COMP. LAWS § 600.6419; MDOC Policy Directive 03.02.131 (effective Oct. 21, 2013).[5] Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a). The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Accordingly, Plaintiff's due process claim against Defendants Simpson, Avery, Lane, and Wright will be dismissed.

---

[5]Indeed, according to his own allegations, Plaintiff was given the paperwork necessary to apply for property loss from the State Administrative Board. (*See* Compl. ¶ GG, docket #1, Page ID#12.)

2.       Transfer to Upper Peninsula

Plaintiff alleges that he was unconstitutionally transferred to the Upper Peninsula, in violation of his right to due process.  As previously discussed, violations of prison policy do not themselves rise to the level of a constitutional violation.  *Laney*, 501 F.3d at 581 n.2; *Brody*, 250 F.3d at 437.  Moreover, the Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification.  *See Olim*, 461 U.S. at 245; *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976).  As the Sixth Circuit explained in *Ward v. Dyke*, 58 F.3d 271 (6th Cir. 1995):

> Prisoners do not have a constitutional right to be incarcerated in any particular institution. *See Meachum v. Fano*, 427 U.S. 215 (1976). Moreover, the Supreme Court has held repeatedly that the ability to transfer prisoners is essential to prison management, and that requiring hearings for such transfers would interfere impermissibly with prison administration. *Id.*; *Olim v. Wakinekona*, 461 U.S. 238 (1983); *Montanye v. Haymes*, 427 U.S. 236 (1976). "Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." *Meachum*, 427 U.S. at 228.

*Ward*, 58 F.3d at 274.  Plaintiff's due-process claim based on his transfer therefore will be dismissed.

3.       Placement of books on restricted-publication list

To the extent that Plaintiff claims that he was unlawfully deprived of his property by the official policy undertaken by Defendant Heyns to place the books Plaintiff purchased on the restricted-publication list, he also fails to state a due process claim.  "The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law."  *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005).  To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake.

*Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Analysis of a procedural due process claim involves two steps:  "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner.  *See Meachum*, 427 U.S. at 225.  In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause.  According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).

Plaintiff does not and cannot demonstrate that the placement of a book on the restricted-publication list caused him to experience an atypical and significant hardship.  He argues only that he would like to improve his electrical skills for rehabilitative purposes so that he can become a master electrician.[6]  Federal courts consistently have found that prisoners have no constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs based on the Fourteenth Amendment.  *See, e.g., Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F. App'x 427, 429

---

[6]The Court notes that Plaintiff is serving a life sentence without the possibility of parole, rendering the possibility of becoming a master electrician negligible at best.

(6th Cir. 2003) (prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952-54 (6th Cir. 1989) (no constitutional right to rehabilitation); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services). Without a protected interest in rehabilitation, Plaintiff cannot demonstrate that Heyns deprived him of due process in reclassifying the books in question.

## D.     Retaliation

Plaintiff alleges that he was transferred to KCF in the Upper Peninsula in retaliation for his filing of grievances.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

"Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary

firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005). *See, e.g., Smith v. Yarrow*, 78 F. App'x. 529, 543 (6th Cir. 2003) ("transfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights") (internal quotation marks omitted). If, however, a foreseeable consequence of a transfer would be to substantially inhibit a prisoner's ability to access the courts, then such a transfer could be considered an "adverse action" that would deter a person of ordinary firmness from continuing to engage in the protected conduct. *See Siggers-El*, 412 F.3d at 702 (holding that a transfer was an "adverse action," where the transfer resulted in plaintiff losing a high paying job that paid for his lawyer fees and moved him further from the attorney); *Johnson v. Beardslee*, No. 1:06-CV-374, 2007 WL 2302378, at *5 (W.D. Mich. Aug. 8, 2007). Similarly, the Sixth Circuit has held that a transfer to segregation or to an area of the prison used to house mentally disturbed inmates could be sufficiently adverse. *See Thaddeus-X*, 175 F.3d at 398; *see also Hill*, 630 F.3d at 468.

Plaintiff previously was housed at Security Level II at IBC, a prison housing Level I, II and IV prisoners, as well as prisoners in protective housing and administrative segregation. *See* MDOC Prison Directory, http://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1385-5481--,00.html (last visited Sept. 3, 2015). He was transferred, as a Level II prisoner, to KCF, a facility that houses only Level I and II prisoners. *See* MDOC Prison Directory, http://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1385-5164--,00.html (last visited Sept. 3, 2015). As a consequence, Plaintiff's security level and the types of prisoners housed in the prison were, if anything, improved by the transfer. Moreover, Plaintiff wholly fails to allege any fact that

would raise this ordinary transfer to the level of adverse action such as that described in *Siggers-El*, 412 F.3d at 702, *Thaddeus-X*, 175 F.3d at 398, or *Hill*, 630 F.3d at 468.

Moreover, even if he could allege that the transfer amounted to adverse action, Plaintiff's conclusory allegations of retaliation wholly fail to meet the third prong of the *Thaddeus-X* standard.   It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence.  *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985).  "[A]lleging merely the ultimate fact of retaliation is insufficient."  *Murphy*, 833 F.2d at 108.  "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'"  *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive).  Plaintiff merely alleges the ultimate fact of retaliation in this action.  He has not presented any facts to support his conclusion that any Defendant he grieved was responsible for his transfer or that any Defendant retaliated against him because he filed a grievance.  Plaintiff alleges that he filed grievances against Defendants Simpson, Avery and Lane, the latest of which was initiated in early November 2014.  Beyond his conclusory allegation of conspiracy, which the Court previously has rejected,  Plaintiff alleges no fact suggesting that those responsible for his transfer were in any way connected to Simpson, Avery or Lane, and the decision to transfer him did not occur until

March 26, 2015.  For all these reasons, Plaintiff's speculative allegations of retaliation fail to state a claim.

### E.       Free Speech

In his final claim, Plaintiff argues that, by denying him access to the books on wiring he ordered and by placing two of those books on the restricted-publication list, Defendants violated his First Amendment rights.

The First Amendment prohibits states from "abridging the freedom of speech."  U.S. CONST. amend. I.  "Freedom of speech is not merely freedom to speak; it is also freedom to read." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005) (citing cases).  While inmates retain certain constitutional rights, prison officials may impinge on these constitutional rights if the regulation "is reasonably related to legitimate penological interests."  *See Turner v. Safley*, 482 U.S. 78, 89 (1987).  To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess an official's actions by reference to the following factors: (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.  *Turner*, 482 U.S. at 89-90.  Moreover, as continually emphasized by the Supreme Court, the problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts.  *See Turner*, 482 U.S. at 84-96; *Washington v. Harper*, 494 U.S. 210, 224 (1990); *O'Lone v. Estate of Shabazz*, 482 U.S.

- 19 -

342, 349 (1987); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Jones v. North Carolina Prisoners'*
*Labor Union, Inc.*, 433 U.S. 119, 125-126 (1977).  These concerns are even stronger when a state
penal institution is involved.  *Glover v. Johnson*, 138 F.3d 229, 241 (6th Cir. 1998).

Applying this standard, the Supreme Court has upheld a variety of limitations on First
Amendment protections.  *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (holding that prisoners do
not have a First Amendment right to provide legal assistance to other prisoners) (quoting *Pell v.*
*Procunier*, 417 U.S. 817, 822 (1974) (sustaining proscriptions on media interviews)); *Thornburgh*
*v. Abbott*, 490 U.S. 401, 419 (1989) (applying *Turner* standard to a prison ban on certain
publications); *Turner*, 482 U.S. at 93 (restricting inmate-to-inmate correspondence).  *See also North*
*Carolina Prisoners' Labor Union, Inc.*, 433 U.S. at 133 (upholding ban on prisoner labor unions).

Defendants' prohibitions on the receipt of detailed books about wiring and welding
unquestionably are reasonably related to legitimate penological interests.  With respect to the first
prong of *Turner*, the prison articulated a legitimate penological interest in banning the books.
Notwithstanding Plaintiff's vociferous claims that he was not told why the books were considered
dangerous to the security and good order of the facility, the attachments to his complaint clearly
indicate that Defendant Simpson stated in her notice of intent to confiscate Plaintiff's four books,
Welding, Welder's Handbook, The Complete Guide to Wiring, and Codes for Homeowners, that the
notice was issued because the books were similar to other books on the restricted-publication list
and because "[t]he information in these books could be used by a prisoner to disable electrical
systems in the facility to aid in an escape attempt or to upset the operations of the facility."  (*See*
8/29/14 Not. of Intent, docket #1-1, Page ID#27.)  Moreover, the administrative hearing report stated
the same reason for the hearing, and the hearing officer found that, based on the reported concern,

the books should be prohibited under MICH. DEP'T OF CORR., Policy Directive 05.03.118 ¶ MM, for

being "a threat to the security, good order,[] or discipline of the facility."  (9/4/14 Admin. Hr'g

Report, docket #1-1, Page ID#30.)

The risks posed by prisoners with access to detailed wiring guides and codes and

advanced welding instructions is obvious on its face.  To paraphrase the Seventh Circuit in *Munson*

*v. Gaetz*, 673 F.3d 630 (7th Cir. 2012), "just as prison officials wouldn't need to say much in

restricting access to books containing information about how to make knives, or how to pick locks,

there isn't much to say in justifying a decision to restrict access to books containing information

about [wiring systems and welding techniques]."  *Id.* at 633-34; *see also Murphy v. Lockhart*, 826

F. Supp. 2d 1016, 1035 (E.D. Mich. 2011) (upholding the restriction of books including instructions

on how to write in code); *Ciempa v. Jones*, 745 F. Supp. 2d 1171, 1193 (N.D. Okla. 2010)

(addressing the confiscation of a book describing how to scale walls and travel under or over barbed

wire).  Further, the risk is not limited to Petitioner's own exposure to information about electrical

wiring, some of which he alleges he already learned from his prison job, but also includes the risk

of having the book in the general population, where other prisoners who have not passed security

screenings may access the information.

Moreover, Plaintiff has ample access to other written materials, and he does not

allege that he is otherwise restricted from speaking freely.  Indeed, he has alleged that, because of

his job security classification, he is permitted to learn some aspects of wiring.  Further, he has not

suggested any means by which the prison could protect its legitimate penological interest in

protecting the prison population from having access to information about wiring schemes and

welding methods than to reject the books on wiring and welding.  Given the deference owed to prison administrators, *Turner*, 482 U.S. at 84-96, Plaintiff fails to state a First Amendment claim.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal.  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.


Dated:  September 23, 2015                    /s/ Janet T. Neff
                                              Janet T. Neff
                                              United States District Judge

- 22 -